HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| ROLANDO HERNANDEZ, | CASE NO. C04-5539-RBL |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| VANCOUVER CITY OF, | DKT. #563 |
| Defendant. | |

THIS MATTER is before the Court on remand from the Ninth Circuit Court of Appeals [Dkt. #563]. The Court reconsiders whether to impose sanctions on Plaintiff Hernandez's attorney, Thomas Boothe, for intimidating Debra Quinn, an assistant city attorney for Defendant City of Vancouver and a witness in the underlying case. The Court has already found Quinn's account of Boothe's intimidation effort credible (and Boothe's explanation not), and it will not revisit that finding now, five years later. It will instead focus—as directed by the Ninth Circuit— on (1) whether Boothe's actions amounted to witness intimidation, (2) and if so, whether to impose sanctions.

**I. DISCUSSION**

In 2002, Hernandez complained his Vancouver Fire Shop coworkers were discriminating

ORDER - 1

1  against him. He filed a complaint with the Equal Employment Opportunity Commission. Quinn
2  prepared the City's response. The Commission entered a probable cause finding, and in 2004,
3  Hernandez sued the City of Vancouver and his supervisor for employment discrimination. Quinn
4  waived service and answered for both defendants. Outside counsel then took control of the case,
5  although Quinn's name remained in CM/ECF as an attorney of record. Lead counsel changed
6  hands a couple more times, but ultimately, Robert Christie served as Defendants' lead counsel.

Quinn was not Defendants' attorney or advocate but a witness and client-representative for the City. Boothe was fully aware of this—he deposed Quinn in April 2006. *See* Dkt. #578 (Vancouver Brief) at Ex. 1 (Quinn Dep.). He asked about matters an attorney engaged to defend the case would have claimed was work product: her perception of Hernandez during the EEOC process, her involvement in investigating his allegations, her communications with his former counsel, and how she interacted with Human Resources during the investigation. *See id*.

Boothe stopped serving the City Attorney's office, serving only Christie Law Group, by January 2011. Defendants identified Quinn as a potential witness in May 2012. Boothe did not object. He prepared his cross-examination of her. *See* Dkt. #504, Ex. 4 (Boothe's billing records) at 7. At that time, the City's counsel also reminded Boothe he did not have permission to contact Quinn outside of their presence. Boothe's paralegal updated his "Debra Quinn witness outline" on June 7, a few days before the start of trial. *See id*. at 28.

At the start of voir dire, the Court identified Quinn as a potential witness. She was introduced as the City's client representative, not its attorney. She sat at defendants' table in that role. Quinn did not participate as an attorney in any aspect of the trial; indeed, the transcripts reveal she never spoke a word in the jury's presence: She did not introduce herself, conduct voir dire, give an opening statement, or examine a witness. She did not argue to the Court.

1   On the second day of trial, Boothe stopped Quinn as she was walking into the courtroom
2  after lunch. Alone in the hallway, without City counsel present, he informed Quinn her estranged
3  husband had called him nine months before to inquire whether she and Boothe were having
4  relations, and that he knew the City had held a confidential mock trial. Boothe also told her he
5  knew, from a rumor circulating around the City, she was having an extramarital relationship with
6  the former city manager. Quinn entered the courtroom, and Boothe followed. He said, "I just
7  wanted you to know that **before you testify next week**." Dkt. #305 (Contempt Hearing
8  Transcript) (emphasis added).

9   Quinn reported Boothe's statements to counsel, and prepared a letter to the Court
10 detailing Boothe's conversation with her. The same morning, the Court received notes from two
11 jurors expressing concern that Boothe was coaching his witnesses:

THE COURT: Please be seated. I have received a couple questions from the jury, or comments.

"Juror No. 5: I notice the prosecuting attorney shaking his head yes or no while looking at the witness during cross-examination. Not sure if it's just in anticipation of knowing the witness or 'signaling' answers to the question."

"Juror No. 4 (Heather Smith): Yesterday during Sue Collins and Arnold's time on the witness stand, the prosecuting attorney, Mr. Boothe, would be sitting while Bob was cross-examining and while everyone's attention was on the witness, he would shake his head yes or no violently and lip yes or no over and over again while making eye contact with the witness, directly after Bob asked his question. On both occasions, the witness answered exactly as the prosecuting attorney had scripted."

Those are the two letters. And then more importantly is a letter I received from Debra Quinn this morning. You better read it, Mr. Boothe.

Dkt. #278 (Mistrial Transcript).

The Court heard from Boothe and Christie, and declared a mistrial on June 14, 2012.[1] It

---

[1] Boothe's attempt to excuse his conduct by claiming he never believed Quinn was going to testify is demonstrably untrue. Like his claim that his witness coaching was the result of a "medical condition," and the act of intimidation itself, it reflects poorly on his character and veracity. There are other examples not specifically part of the Court's finding of bad faith that are worth noting for context:
First, Boothe asked the Court to continue the trial for private reasons on September 15, 2011—just days after Ms. Quinn's husband informed Boothe of the defense's mock trial. The

reasoned Boothe's actions towards Quinn and towards his witnesses had tainted the judicial process adversely:

> THE COURT: Please be seated. Ladies and gentlemen, I have, with regret, declared a mistrial, and I want to explain in part why and to say that I am appreciative of the jurors who asked questions and made comments about what they were seeing; and the effect on the trial was noted, but it was only part of the calculus in the decision for mistrial.
> There is strong reason to believe that misconduct by one of the attorneys has occurred, both inside this courtroom and outside. And so I don't want you to feel regret or feel bad that your speaking up derailed the trial. It's not your

*Id.*

After reviewing the parties' briefings, it held a civil contempt hearing in October to investigate whether Boothe was guilty of witness tampering and coaching and whether to impose sanctions on him. *See* Dkt. #301, #305 (Contempt Hearing Transcript). The Court heard testimony from Quinn, Boothe, and others. Quinn testified Boothe's statements to her had made her feel objectified and intimidated:

---

Declaration in support of that motion is sealed, but in hindsight, the timing is more than a little suspicious.

Similarly dubious is Boothe's explanation for Mr. Hernandez's absence from trial on the morning the jurors sent their notes and Quinn sent her letter. It is far more likely Boothe orchestrated Hernandez's absence so that Hernandez would not be present for discussions about his attorney's misconduct. Indeed, when the Court expressed its preference to proceed with the trial and to take up the notes and letter later, Boothe made sure the issue was discussed immediately, while Hernandez was absent. The Court simply does not believe Hernandez had a "panic attack" at that very moment his attorney was "busted" for coaching witnesses.

DKT. #563 - 5

```
1    A         I interpreted that as he was trying to get
2    one on me, to intimidate me, to make me feel small and
3    worthless.
4    Q         How did that encounter make you feel about
5    your upcoming testimony?
6    A         Very intimidated.  Scared.  Embarrassed.
7    Shocked.  Floored.  I had never experienced anything
8    like that.  And I did not know how to even process
9    that, let alone acknowledge that in an open courtroom.
```

Dkt. #305 (Transcript from Contempt Hearing) at 32–33.

```
11   Q         Now, you say you were concerned-- in this--
12   the concern you had from this conversation with
13   Mr. Boothe was that in the event you were called as a
14   witness the next week, certain of these personal
15   issues might come out in questioning by Mr. Boothe.
16   Is that the gist of it?
17   A         It is so much more than that.  It's sort of
```

> like the trifecta of intimidation. Mr. Boothe threw
> in placing me as a sex object. He threw in my
> divorce. He threw in my personal relationship with
> the prior city manager all into one conversation,
> short conversation, and ended the conversation with, I
> just wanted you to know that before you testify next
> week.
> Q    But you were concerned at that point that if
> you were called to testify, that some of these issues
> might come up, is that right?
> A    Yes.

*Id.* at 51–52.

The Court concluded Boothe's witness coaching was not in bad faith but his intentional intimidation of Quinn was. It reasoned Boothe's witness coaching adversely affected his client's ability to obtain a fair trial, influenced the jury, and was "borderline," but did not alone amount to bad faith. *Id.* at 199. It sanctioned him for wasting the Court's, the parties', and the jury's time. *See id.* at 200.

The Court concluded Boothe intimidated Quinn in bad faith: his saying she "should know those things before her testimony … turned an offensive cynical statement into an offense against the Court and the judicial process." *Id.* at 201. The Court did not impose an additional sanction on Boothe for this contemptuous act, however, because the penalty imposed for wasting the Court's time was enough of a deterrent and punishment for both acts. After reviewing additional briefings, the Court sanctioned Boothe $145,765.43. *See* Dkt. #310 (Order Imposing

Sanctions), #313.

The Honorable Judge Settle presided over the retrial. Quinn testified. *See* Dkt. #436 (Transcript of Cross-Examination of Quinn). Boothe largely stood down, mostly passing the case off to another attorney. Hernandez ultimately prevailed.

Boothe appealed the Court's finding of contempt and imposition of sanctions [Dkt. #315]. The Ninth Circuit concluded (1) the Court improperly determined Boothe's "hallway conversation" with Quinn was witness intimidation done in bad faith because Quinn was an attorney of record who likely could not have testified under Washington's Rules of Professional Conduct, and (2) the Court improperly sanctioned Boothe for "making faces" at his witnesses because it had reasoned he did not do so in bad faith. The Circuit remanded the case, instructing the Court that if sanctions are justified for Boothe's "conversation" with Quinn, it must articulate this rationale more clearly. *See* Dkt. #562 (Memorandum). The Court asked the parties to brief the effects of the Ninth Circuit's remand and whether the Court should reaffirm its decision to impose sanctions on Boothe for intimidating Quinn.

The City argues the Court should reaffirm its contempt finding and issuance of sanctions [Dkt. #578]. It argues Quinn was a witness and not acting as an attorney-advocate. It also encourages the Court to find Boothe's witness coaching constituted "objective recklessness," warranting sanctions. It acknowledges that if the Court does not do so, and if the Court declared a mistrial only because of the effect Boothe's "making faces" had on the jury, then the Court should set aside the fees and expenses incurred through mistrial ($85,772.95) and reduce the amount owed to $59,992.48.

Boothe asks the Court to vacate the sanctions [Dkt. #577]. He argues his conversation with Quinn, which was outside the jury's presence and to an attorney of record, did not lead the

Court to declare a mistrial, and because there is no causal link between that conversation and the declaration of a mistrial, the Court should not reimpose sanctions. He argues Judge Settle effectively imposed sanctions on him by lowering his attorney fee award.

This Court has rarely found an attorney in contempt and issued sanctions in fourteen years. This Court regrets if its reluctance to discipline attorneys led it to develop an incomplete or unclear record. But its steadfast opposition to sanctioning attorneys underscores the egregiousness of Boothe's acts.

Washington's Rules of Professional Conduct protect an opposing party and the tribunal "when the trier of fact may be confused or misled by a lawyer serving as both advocate and witness" at trial and "where the combination of roles may prejudice [the opposing] party's rights in the litigation." RPC 3.7, comment 2; *see also United States v. Microsoft Corp.*, No. C15-00102RSM, 2015 WL 12657107, at *1 (W.D. Wash. July 17, 2015) (allowing two attorneys of record to testify at an evidentiary hearing because they were not acting as advocates at trial, so there was no risk of prejudice).

Quinn only appeared at trial as a client-representative and witness, so her testimony would not have violated Washington's Rules. She performed no substantive work after January 2011, at the latest, and she never argued, or even spoke, before the jury. She was introduced as a client-representative and named as a potential witness. Boothe's own billing records demonstrate his preparation for, and anticipation of, her testimony. Because she only appeared at trial in one role, Quinn's testimony presented no risk of confusing or misleading the jury and no risk of prejudice to Hernandez. Her name remained in CM/ECF as an oversight only.

Boothe harassed Quinn by attacking her character as a woman. He made her feel physically and emotionally vulnerable to obtain a tactical advantage. By approaching her outside

1  counsel's presence and in an empty hallway, he made her feel physically isolated and unsafe. By
2  mentioning her relationship with the former city manager, a private and personal matter far
3  outside the scope of professional conversation, he needlessly attacked her character. By doing so
4  soon before her expected testimony—indeed nine months after he first learned about it—Boothe
5  made her fear taking the stand. He made Quinn worry about airing her personal matters in open
6  court, on the record, for all time, and how this record could be used against her in her contested
7  divorce and custody proceedings. The Court will not sit idly by as an officer of the court makes a
8  witness feel "small, worthless, intimated, scared, embarrassed, shocked, floored" and like a sex
9  object. That Quinn has training as an attorney is utterly irrelevant.

10  Nevertheless, Boothe apparently argues with a straight face that his statements to Quinn
11  were not harassing or intimidating because "there was no chance" she was going to testify if the
12  Court did not allow evidence of the EEOC process. Dkt. #305 (Contempt Hearing Transcript) at
13  181; *see also* Dkt. #577 (Boothe Briefing) at 3–6. This demonstrably false post-hoc
14  rationalization further demonstrates his dishonesty. Quinn was listed as a potential witness who
15  could have been called to testify about a host of matters, whether the Court admitted testimony
16  about her involvement in the EEOC process or not. Indeed, during retrial, she testified about
17  Vancouver's policies and operating principles regarding diversity, training, harassment, and
18  retaliation and about her attempt in 2004 to arrange an interview with a former City employee,
19  who later testified too. Boothe even told Quinn he wanted her to know he knew this salacious
20  information about her before she testified.

21  Boothe consciously and maliciously engaged in pre-planned bad faith conduct. Courts
22  have the power to punish exactly this sort of conduct. *See Chambers v. NASCO, Inc.*, 501 U.S.
23
24

32, 44, 111 S. Ct. 2123 (1991).[2] The Court's power to punish for contempt "reaches both conduct before the court and that beyond the court's confines, for the underlying concern that gave rise to the contempt power was not merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial." *Id.* (quoting *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798, 107 S. Ct. 2124 (1987)) (internal punctuation omitted). A court "must exercise caution in invoking its inherent power, and it must comply with the mandates of due process," but it may impose attorney's fees as a sanction when a party acts in bad faith, vexatiously, wantonly, or for oppressive reasons. *Id.* at 45–46, 50. A party "demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) (quoting *Hutto v. Finney*, 437 U.S. 678, 689 n. 14, 98 S. Ct. 2565 (1978)) (internal punctuation omitted).

Boothe's intimidation of Quinn delayed and disrupted the litigation process. His actions interrupted trial and necessitated the Court's holding of a contempt hearing and receipt of multiple rounds of briefing. They eroded the integrity of the judicial process, and not to forget, hurt Quinn, her family, and Hernandez, who required new representation during the retrial.

His bad faith litigation misconduct warrants an imposition of monetary sanctions because no lesser sanction would adequately deter and punish his bullying of Quinn and disrespect for the judiciary. Judge Settle's fee award served no deterring, compensatory, or punitive purpose because he awarded Boothe his fees after this Court had already considered and imposed sanctions. Due process would not allow Judge Settle to sanction Boothe, a second time, for

---

[2] If courts do not, the Ninth Circuit should publish its opinion so holding, to put the honorable are on notice that such conduct—harassment—is now tolerable.

conduct Judge Settle was not privy to. Doing so was, and is, within this Court's purview.

When the Court granted Defendants a mistrial, it based its decision on Boothe's unprofessional conduct inside and outside the courtroom and on how that conduct affected the litigation. Four months later, the Court clarified at the contempt hearing that its decision to declare a mistrial was based solely on the effect Boothe's witness coaching had on the jury:

```
THE COURT:  The mistrial was accomplished by the
notes from the jurors, because that-- that permeated
through and adulterated the deliberation process
eventually, because those two jurors are going to
speak to the other jurors when they have an
opportunity in the whole deliberation process.  And
that's not fair to Mr. Hernandez.
    MR. ROTHWELL:  I appreciate that.
```

Dkt. #305 at 198. Boothe therefore does not bear responsibility for the fees and expenses incurred through mistrial, as under instruction from the Ninth Circuit, the Court will not reconsider sanctioning him for his witness coaching. Boothe must reimburse the City only for its fees resulting from his bad faith intimidation of Quinn: those incurred through and after the contempt hearing. Boothe owes $59,992.48. *See* Dkt. #310 (Order Imposing Sanctions) at 9.

## II.      CONCLUSION

Boothe's actions throughout this litigation shocked this Court's conscience. His harassment and intimidation of Quinn—a witness, a woman, and a human being—is deplorable and contemptuous. His actions clearly and convincingly disrupted and delayed the litigation process and demonstrated a complete disregard for the integrity of the judicial system. Boothe

intimidated a witness in bad faith. He must reimburse the City $59,992.48 for the fees it incurred through and after his contempt hearing. In this Court's experience, no lesser sanction could effectuate justice.

IT IS SO ORDERED.

Dated this 11th day of May, 2017.

_____
Ronald B. Leighton
United States District Judge